UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINTECH GLOBAL, INC.,

    Plaintiff,

v.

CAN SOFTTECH, INC., and
SWAPNA REDDYGARI,

    Defendants.
_____/

Case No. 2:19-cv-11600
Honorable Linda V. Parker
Mag. Judge David R. Grand

## OPINION AND ORDER (1) DENYING DEFENDANTS' MOTION TO DISMISS PURSUANT TO 12(B)(2) AND (2) DENYING TRANSFER

Plaintiff LinTech Global, Inc. ("Plaintiff") initiated this lawsuit against Defendants CAN Softtech, Inc. ("CAN") and Swapna Reddygari ("Reddygari") by filing a Verified Complaint for Injunctive and Other Relief (the "Complaint") in Michigan State Circuit Court in Oakland County, Michigan. (ECF No. 1, PageID 7.) Upon recognition of the parties' complete diversity, Defendants removed the matter to the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. §§ 1441 and 1446. (*Id.* at 1.) Plaintiff's Complaint alleges four counts: breach of duty of loyalty and unjust enrichment by Defendant Reddygari, breach of contract by Defendant CAN, and trade secret misappropriation by both Defendants. (*Id.* at 14–17.) Presently this matter is

before the Court on Defendants' Motion to Dismiss and/or Transfer (the "Motion"). (ECF No. 11.) The Motion has been fully briefed, and the Court held a hearing on June 18, 2019. (ECF Nos. 11, 14, 17.)

## I. Factual and Procedural History

Plaintiff LinTech is an information technology contractor, providing support services to federal government agencies on different projects. (ECF No. 1, PageID 8.) In its Complaint, Plaintiff alleges as follows. Since September 26, 2014, Plaintiff—holding a prime contract—provided software development, project management, operation, and maintenance support services for the Federal Aviation Administration ("FAA") Designee Management System ("DMS") (also referenced as the "FAA project"). (*Id.* at 9.)

On or about April 17, 2017, Plaintiff hired Defendant Reddygari as a full-time employee responsible for managing the daily, on-site operations of the FAA project. (*Id.*) Defendant Reddygari performed her duties related to the FAA project at a LinTech office[1] in Virginia. (*Id.*; ECF No. 11, PageID 130.) Subsequently, Plaintiff promoted Defendant Reddygari; sometime in 2018, she began serving as Plaintiff's only Project Manager and Site Manager for the FAA

---

[1] Defendant Reddygari's initial offer letter identified the project location at an address in Fairfax, VA; this letter also displayed Plaintiff's business address in Farmington Hills, Michigan. (ECF No. 11, PageID 129; ECF No. 11-2, PageID 150.)

2

Project. (*Id.*) In this role, she directly reported to Michael Lin, Plaintiff's President and Owner, and Ursa Hopkins, Plaintiff's Chief Operating Officer. (*Id.*) Also, she frequently interacted with Plaintiff's FAA customer and was relied upon to communicate customer concerns and to oversee that Plaintiff's duties related to the FAA project were met. (*Id.*) Additionally, Defendant Reddygari's responsibilities included: making recommendations on whether additional positions were necessary for the FAA project, making recommendations on selecting subcontractors for the FAA project, and making hiring and firing decisions related to the FAA project. (*Id.*)

During Defendant Reddygari's tenure at LinTech, she recommended and "convinced" Mr. Lin—LinTech's President and Owner—that the subcontractor, Defendant CAN, should be hired to assist Plaintiff with the FAA project. (*Id.* at 10.) CAN, like LinTech[2], is a company providing information technology support services. (*Id.*) Although Defendant Reddygari disclosed to Plaintiff that Amar Chandagari, President of CAN Softtech, Inc., was her husband, she also represented that there would be no conflict of interest in hiring her husband's company to work on the FAA project because "her allegiance was with LinTech[,] and CAN would be treated like any other subcontractor." (*Id.*) As a result, Plaintiff

---

[2] But for the Agreement, Plaintiff LinTech views Defendant CAN as a direct competitor. (*Id.* at 10.)

hired Defendant CAN as a subcontractor; the parties entered into an "Indefinite Delivery Indefinite Quantity" Agreement (the "Subcontractor Agreement" or the "Agreement") on or around May 2, 2018. (*Id.*) At the time of the Agreement, neither Defendant disclosed that Defendant Reddygari had any ownership interest or any managerial role at CAN Softtech, Inc. (*Id.* at 10, 12.) While working full-time for Plaintiff on the FAA project, however, Defendant Reddygari had an ownership interest in and served as the Chief Executive Officer of CAN Softtech, Inc.[3] (*Id.* at 10, 12.)

After Plaintiff contracted with Defendant CAN for services related to the FAA project, CAN and its employees were increasingly used. (*Id.* at 11.) By November 2018, LinTech employees working on the FAA project were reduced from 100% of the positions to 4 of 19 (21%) of the positions—the 15 other positions being filled by CAN employees. (*Id.*) Although Mr. Lin addressed balancing the number of Plaintiff's and Defendant's employees on the project, Defendant Reddygari continued to use mostly CAN employees. (*Id.*)

Because the FAA project did not have a set expiration[4], Defendant Reddygari had the responsibility of updating Mr. Lin on when and whether the project was up for re-bid or might end. (*Id.*) Defendant Reddygari informed Mr.

---

[3] Defendants stated that "Defendant Swapna Reddygari . . . is Secretary/Treasurer of CAN [and] a partial owner of CAN". (ECF No. 11, PageID 127.)

[4] The FAA project was typically extended on a yearly basis. (*Id.* at 11.)

4

Lin that the FAA project would extend beyond April 2020, but never informed him that it would be re-bid or that Plaintiff's contract was in jeopardy of being terminated. (*Id.*)

Without any prior notice, on May 14, 2019, Defendant Reddygari resigned from her employment with Plaintiff, and Defendant CAN terminated its subcontract with Plaintiff. (*Id.* at 12.) The same day, the FAA ended its relationship with Plaintiff and directly[5] awarded Defendant CAN "substantially the same project as the FAA project that LinTech held for five (5) years". (*Id.*) Upon Defendants' respective resignation and termination, they retained 12 laptop computers that contained Plaintiff's confidential and proprietary information related to the FAA project. (*Id.* at 13.) After Plaintiff demanded the computers' return, Defendants returned them to Plaintiff's Michigan office[6] on May 22, 2019—over a week after Defendants severed their respective relationships with Plaintiff. (*Id.*)

On May 24, 2019, believing Defendants to have misappropriated its confidential and proprietary information, Plaintiff initiated this lawsuit against Defendants by filing a Verified Complaint for Injunctive and Other Relief (the

---

[5] The FAA never publicly solicited bid proposals for the FAA project; it was directly awarded to Defendant CAN without competition. (*Id.* at 12.)
[6] During the hearing, Plaintiff's counsel affirmed, and Defendants did not contest, that the laptop computers were returned to LinTech's Michigan headquarters.

"Complaint") in Michigan State Circuit Court in Oakland County, Michigan, alleging breach of duty of loyalty and unjust enrichment against Defendant Reddygari, breach of contract against Defendant CAN, and trade secret misappropriation against both Defendants. (ECF No. 1, PageID 7, 14–17.) Upon recognition of the parties' complete diversity, Defendants removed the matter to the United States District Court for the Eastern District of Michigan pursuant to 28 U.S.C. §§ 1441 and 1446. (*Id.* at 1.) Presently this matter is before the Court on Defendants' Motion to Dismiss and/or Transfer (the "Motion"). (ECF No. 11.) Defendants argue that Plaintiff's Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction or, alternatively, that Plaintiff's Complaint should be transferred to the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a). (*Id.*) The Motion has been fully briefed, and the Court held a hearing on June 18, 2019. (ECF Nos. 11, 14, 17.)

II.     **Personal Jurisdiction**

"In deciding a motion to dismiss for lack of personal jurisdiction, the district court may rely 'upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions.' " *MAG IAS Holdings, Inc. v. Schmückle,* 854 F.3d 894, 899 (6th Cir. 2017) (citations omitted). Plaintiffs carry the burden of establishing that a district court can exercise jurisdiction over the defendant, however, that

burden is "relatively slight" where, as here, the Court rules without conducting an evidentiary hearing. *Id.* (citation omitted). Also, in this context, Plaintiff must only demonstrate a *prima facie* showing that personal jurisdiction exists. *Id.* (citation omitted).

"Personal jurisdiction can be either general or specific, depending upon the nature of the contacts that the defendant has with the forum state." *Bird v. Parsons,* 289 F.3d 865, 873 (6th Cir. 2002); *see also Calphalon Corp. v. Rowlette,* 228 F.3d 718, 721 (6th Cir. 2000). "General jurisdiction is proper only where a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state." *Id.* Specific jurisdiction, however, is proper only "in a suit arising out of or related to the defendant's contacts with the forum." *Id.* at 874. In this case, Plaintiff concedes that Defendants' contacts with Michigan are insufficient to support general jurisdiction.[7]

In a diversity case, such as this, the Court uses a two-part test to determine whether the district court has personal jurisdiction. *Calphalon,* 228 F.3d at 721. "The exercise of personal jurisdiction is valid only if it meets both the state long-

---

[7] Plaintiff made this concession by raising arguments only concerning specific jurisdiction.

7

arm statute and constitutional due process requirements." *Id.* The Michigan long-arm statute, however, "extends to the limits imposed by federal constitutional due process requirements and thus, the two questions become one." *AlixPartners, LLP v. Brewington,* 836 F.3d 543, 549 (6th Cir. 2016) (citation omitted). Due process requires that (1) the Defendants purposefully availed themselves of the privilege of acting or causing a consequence in Michigan, (2) the cause of action arise from the Defendants' activities, and (3) Defendants' activities or the consequences caused by Defendants' activities have a substantial enough connection with Michigan to make the exercise of jurisdiction reasonable. *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)). Upon consideration, the Court concludes that Plaintiff, having sufficiently demonstrated that Due Process requirements have been met, has made a *prima facie* showing that personal jurisdiction exits as to both Defendants.

### A. Purposeful Availment

To determine purposeful availment, the Court considers whether Defendants acted or caused a consequence in Michigan such that they invoked the benefits and protections of Michigan law. *S. Mach. Co.,* 401 F.2d at 381. The Supreme Court held that a relationship with the plaintiff or a third party, "standing alone, is an insufficient basis for jurisdiction . . . [and] an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary

8

contacts with the forum." *Walden v. Fiore*, 571 U.S. 277, 286 (2014). Where defendant "has created 'continuing obligations' between himself and residents of the forum, he "manifestly has availed himself of the privilege of conducting business there". *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476 (1985) (quoting *Travelers Health Assn. v. Virginia,* 339 U.S. 643, 648 (1950)). Furthermore, "jurisdiction . . . may not be avoided merely because the defendant did not *physically* enter the forum State." *Id.*

In this case, it is true that neither Defendant has physically entered Michigan. Yet Plaintiff's claims against Defendant Reddygari arise out of her employment contract and its claims against Defendant CAN arise out of its Subcontractor Agreement. Both Defendants knowingly and voluntarily entered into contracts of an indefinite period—that is, contracts without a definite term or expiration date—with a resident of Michigan, Plaintiff LinTech. *See Lanier v. American Bd. of Endodontics*, 843 F.2d 901, 910 (6th Cir. 1988) ("the question of which party solicited the business interface is irrelevant, so long as defendant then directed its activities to the forum resident" (citation omitted)).

Indeed, as Defendants stated, a "forum resident's contract with an out-of-state defendant alone is insufficient to automatically establish jurisdiction over the defendant." *Conti v. Pneumatic Prod. Corp.*, 977 F.2d 978, 982 (6th Cir. 1992). The present circumstances, however, are distinguishable from those in *Conti*.

9

There, "substantially all contact between [Plaintiff] and [Defendant] occurred when both . . . were in Florida [outside the jurisdiction of the Court]." *Id.* The present circumstances, however, are more akin to *Burger King*, where the Supreme Court found that a Florida district court did not violate due process in exercising jurisdiction over a Michigan franchisee whose contacts with Florida included his franchise agreement with a Florida corporation and communications to Florida via telephone calls and letters. *Burger King*, 471 U.S. 462.

Here, Defendant Reddygari purposefully availed herself of the privileges of conducting activities in the forum state when she became employed by a company headquartered in Michigan. Moreover, she continuously reported to supervisors working in Michigan and used laptop computers provided by Plaintiff (and later returned to Michigan). *See ACS Consultant Co. v. Williams*, NO. 06-11301, 2007 WL 674608 (E.D. Mich. March 5, 2007) (where court exercised personal jurisdiction over former employees who accessed and used trade secrets); *see e.g.*, *Kelly Services, Inc. v Noretto*, 495 F. Supp. 2d 645, 652–53 (E.D. Mich. 2007); *see also Kelly Services, Inc. v. Eidnes*, 530 F, Supp. 2d 940 (E.D. Mich. 2008). Defendant Reddygari's communications with Plaintiff in Michigan are evidenced by her extensive emails and other telephonic and video communications to Mr. Lin and other Michigan-based LinTech employees. (ECF Nos. 14–2, 14–3, 14–7, 14–8, 14–9, 14–10.) Although Defendants argue that it is not the quantity but the quality

10

and substance of the communications that hold any significance, they concede that "Ms. Reddygari and the CAN representative servicing the FAA project did send numerous emails pursuant to their duties as an employee [of LinTech]." (ECF No. 17, PageID 329–30.) Moreover, Plaintiff's Exhibits A-2 and A-4 provide sample emails that demonstrate the content of the exchanges between Plaintiff and Defendants. (ECF Nos. 14–4, 14–5, 14–6.) The content of the emails ranges from updates on the FAA Project to human resources concerns, which this Court finds to be substantive. (*Id.*)

Furthermore, Defendant CAN purposefully availed itself of the privileges of conducting activities in Michigan when it also entered into an indefinite subcontractor agreement containing a Michigan choice-of-law provision. *Burger King,* 471 U.S. at 482 ("a choice-of-law provision should [not] be ignored in considering whether a defendant has 'purposefully invoked the benefits and protections of a State's laws" for jurisdictional purposes' "). Although the Supreme Court clarified that such a provision standing alone is not sufficient to confer jurisdiction, here the provision does not stand alone.

Similarly, though Defendant Reddygari served as an intermediary with regard to supervision, Defendant CAN's representative who worked on the FAA project also was in direct communication with supervisors (*i.e.*, Mr. Lin) housed in Plaintiff's Michigan headquarters. Under these circumstances, Defendants'

11

contacts cannot be viewed as "random," "fortuitous," or "attenuated" because both knowingly and voluntarily entered into contracts that have "continuing obligations" between themselves and a resident of Michigan. *Id.* at 475[8]; *Burger King,* 471 U.S. at 476. Rather, the Court concludes that Defendants engaged in a "deliberate affiliation with the forum State and [considered] the reasonable foreseeability of possible litigation there." *Id.* Because it is Defendants' intentional conduct that created their contacts with Michigan, the Court concludes that the first *Mohasco* factor is met.

### B. Arising From

Plaintiff alleges Defendants used its confidential and proprietary information. Because Defendants have contractual duties to not use such information for their own benefit, Plaintiff's claims arise directly from its contracts with Defendants. Therefore, Plaintiff has demonstrated that its cause of action is "related to" or "connected with" Defendants' contact with the forum state. *See Miller*, 694 F.3d at 681. Thus, the second factor is met.

### C. Reasonableness

When the first two prongs of the personal jurisdiction test are met, there is an inference of reasonableness. *MAG IAS,* 854 F. 3d at 903–04 (citations omitted).

---

[8] ("This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts" (citation omitted)).

Given that Michigan has a significant interest in interpreting contracts formed under its laws and Plaintiff has a significant interest in the enforcement of its contracts, litigating in Michigan is not so burdensome (as discussed, *infra*) to overcome the presumption of reasonableness. *Id.* ("We look to the following factors in making a reasonableness determination: (1) the burden on the defendant; (2) the forum state's interest; and (3) the plaintiffs' interest in obtaining relief." (citations omitted)). Therefore, the third factor is met.

For the foregoing reasons, the Court concludes exercising jurisdiction over Defendants under the present circumstances would not contravene traditional notions of fair play and substantial justice. Accordingly, the Court denies Defendants' Motion to Dismiss for lack of personal jurisdiction.

### III. Transfer

Pursuant to 28 U.S.C. § 1404(a), "a district court may transfer any civil action to any other district or division where it might have been brought." A district court possesses broad discretion in deciding whether to transfer venue. *Perceptron, Inc. v. Silicon Video, Inc.*, 423 F. Supp. 2d 722, 729 (E.D. Mich. 2006). Generally, venue is proper wherever "a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S. C. § 1391(a)(2). "Any forum with a substantial connection to the plaintiff's claim," constitutes a venue where a "substantial part" of the events occurred. *First of Mich. Corp. v. Bramlet*, 141 F.3d

260, 263 (6th Cir. 1998). Finally, the party seeking transfer bears the burden of establishing by a preponderance of the evidence that transfer to another district is warranted. *Id.* Thus, Defendants must demonstrate by a preponderance of the evidence that: (1) the action could have been brought in the transferee district; (2) a transfer serves the interest of justice; and (3) transfer is in the convenience of the witnesses and parties. With regard to the third factor, an exchange of inconveniences is insufficient to warrant a transfer. *Superior Consulting v. Walling*, 851 F. Supp. 839, 845 (E.D. Mich. 1994) ("transferring venue . . . would simply have exchanged the inconvenience of one party for that of the other").

First, it is clear that this matter could have been brought in the Eastern District of Virginia because both Defendants reside there and a substantial part of the events giving rise to the claim occurred there. *See* 28 U.S.C. § 1391(1)(1)–(2). Second, although the interests of justice could be served by either court, Michigan has a substantial interest in interpreting and enforcing contracts formed under its laws. Therefore, the second factor tips in favor of Plaintiff.

With regard to the third factor, it is also clear that Virginia would be more convenient for Defendants and their material witnesses. However, Michigan would be more convenient for Plaintiff because its material witnesses, its confidential and proprietary information (developed and stored on its servers), the laptop computers used by Defendants, and other documentary evidence are in

Michigan.  The Court notes that Plaintiff elected to file this suit in Michigan, and a district court should defer to a plaintiff's choice. *United States v. Edward Rose & Sons*, 246 F. Supp. 2d 744, 755 (E.D. Mich. 2003) ("a court should defer to a plaintiff's choice of venue and a defendant moving for transfer must overcome the presumption that plaintiff has chosen the proper forum").  Also, both Defendants' contractual relationships were administered in Michigan, and Defendant CAN agreed for the Subcontractor Agreement to be bound by Michigan law.  Given these facts, the Court views a venue transfer under the present circumstances to equate to an "exchange of inconveniences."  As such, the Court concludes that Defendants have not met their burden, nor have they demonstrated that a transfer is needed in this matter.  Therefore, the Court concludes that the balance of factors weighs in favor of retaining the case in the Eastern District of Michigan.

IV.   **Conclusion**

Accordingly,

**IT IS ORDERED,** that Defendants' Motion to Dismiss or Transfer (ECF No. 11) is **DENIED**.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: July 18, 2019