UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINTECH GLOBAL, INC.,

    Plaintiff,

v.

CAN SOFTTECH, INC., and
SWAPNA REDDYGARI,

    Defendants,

And

CAN SOFTTECH, INC.,

    Counter-Plaintiff,

v.

LINTECH GLOBAL, INC.,

    Counter-Defendant.
_____/

Case No. 2:19-cv-11600
Honorable Linda V. Parker

## OPINION AND ORDER DENYING DEFENDANTS' PARTIAL MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT (ECF NO. 38)

Plaintiff LinTech Global, Inc. initiated this lawsuit against Defendants CAN Softtech, Inc. ("CAN")—a former LinTech subcontractor—and Swapna Reddygari ("Reddygari")—a former LinTech employee—after the Federal Aviation Administration ("FAA") terminated its contract with Plaintiff and engaged

Defendants to do "substantially the same project." (Am. Compl., ECF No. 37 at Pg. ID 592-93, 597.) In its Amended Complaint, Plaintiff alleges (i) breach of duty of loyalty against Reddygari; (ii) breach of contract against CAN; (iii) trade secret misappropriation against both Defendants; (iv) unjust enrichment against Reddygari; and (v) tortious interference with a business relationship or expectancy against both Defendants. (*Id.* at Pg. ID 600-05.) The matter is presently before the Court on Defendants' Partial Motion to Dismiss Plaintiff's First Amended Complaint. (ECF No. 38.) The motion has been fully briefed. (ECF Nos. 42, 43.) For the reasons set forth below, the Court denies the motion.

## FACTUAL AND PROCEDURAL HISTORY

LinTech, an information technology contractor, provides support services for several federal government agencies. (ECF No. 37 at Pg. ID 592-93 ¶¶ 6-7.) On September 26, 2014, LinTech and the FAA entered into a contract under which LinTech provided software development, project management, operation, and maintenance support services ("FAA Project"). (*Id.* at Pg. ID 593 ¶ 7.)

On or around April 17, 2017, LinTech hired Reddygari as an employee. (*Id.* at Pg. ID 593 ¶ 8.) In this role, Reddygari was to manage the day-to-day, on-site operations of the FAA Project, which was performed at a LinTech office. (*Id.*) Eventually, LinTech elevated Reddygari to sole project and site manager, and she served as one of the highest ranking and highest paid LinTech employees with

respect to the FAA Project. (*Id.* at Pg. ID 593 ¶ 9.) She regularly and frequently interacted with FAA representatives and stakeholders, as well as directly reported to LinTech's President and owner, Michael Lin, and LinTech's Chief Operating Officer, Ursa Hopkins. (*Id.* at Pg. ID 593, 596 ¶¶ 9, 22.) Reddygari was additionally responsible for the hiring and firing decisions concerning the FAA Project, and made recommendations to Mr. Lin about whether additional positions and subcontractors were necessary. (*Id.* at Pg. ID 593 ¶ 10.) LinTech also relied on Reddygari to communicate the FAA's concerns and ensure that LinTech's duties with respect to the FAA Project were satisfied. (*Id.*)

During the course of her employment, Reddygari was exposed to, had access to, and frequently used LinTech's confidential and proprietary information, including its sensitive pricing, technical, process, customer, staffing and labor information. (*Id.* at Pg. ID 593-94 ¶ 11.) She also had access to LinTech's FAA Project-related financial information, invoices, project budgets, project financial information, business plans, banking information, certification documents, staffing strategy, and labor information (including how much each employee and subcontractor was being paid). (*Id.*)

Shortly after she was hired, Reddygari recommended to Mr. Lin that a subcontractor, CAN, be hired to assist LinTech with aspects of the FAA Project. (*Id.* at Pg. ID 594 ¶ 12.) Reddygari disclosed that her husband, Amar Chandagari,

3

served as the President of CAN, but represented that her working for LinTech and the hiring of CAN would not create a conflict of interest because her allegiance was with LinTech and CAN would be treated like any other subcontractor. (*Id.* at Pg. ID 594 ¶ 13.) As a result, on or around May 2, 2017, LinTech hired CAN as a subcontractor and they entered into an "Indefinite Delivery Indefinite Quantity" agreement ("Subcontractor Agreement"). (*Id.* at Pg. ID 594 ¶ 14 (citing Ex. A, ECF No. 37-2).) LinTech eventually learned that Reddygari, while working for LinTech on the FAA Project, served as the Chief Executive Officer of and had an ownership interest in CAN. (*Id.* at Pg. ID 595 ¶ 15.) Reddygari never disclosed this information to LinTech. (*Id.* at Pg. ID 594, 598, 604 ¶¶ 15, 32, 59.)

CAN, similar to LinTech, is an information technology support company. (*Id.* at Pg. ID 595 ¶ 16.) LinTech alleges that, but for the Subcontractor Agreement, CAN would be LinTech's direct competitor. (*Id.*) Article 9 of the Subcontractor Agreement states:

> Contractor agrees that all technical, business and financial information and material disclosed or transmitted to it by LinTech during Contractor's performance under this Contract shall be received and maintained in strict confidence, be used only for the purposes of this Contract, not be disclosed by the Contractor, its employees or agents without the prior written consent of LinTech and remain the property of LinTech.

(*Id.* at Pg. ID 595 ¶ 17.) After the execution of the Subcontractor Agreement, LinTech provided CAN with access to LinTech's software, computer systems, and

4

the files therein, which included LinTech's confidential and proprietary corporate, employee, customer, and financial records. (*Id.* at Pg. ID 595 ¶ 18.)

As time progressed and Reddygari's role regarding the FAA Project expanded, CAN was increasingly utilized with respect to the project. (*Id.* at Pg. ID 595-96 ¶ 19.) At the commencement of the FAA Project, LinTech employees constituted 100 percent of the individuals working on the project; by November 2018, four LinTech employees remained on the project, while the remaining 15 positions were occupied by CAN employees. (*Id.* at Pg. ID 596 ¶ 20.) At some point, Mr. Lin asked Reddygari about balancing the number of CAN and LinTech employees on the project. (*Id.* at Pg. ID 596 ¶ 21.) LinTech alleges that Reddygari resisted hiring LinTech employees and continued to utilize CAN employees. (*Id.*)

The FAA Project did not have a set expiration date. (*Id.* at Pg. ID 596 ¶ 22.) Rather, it was extended on a yearly basis and, accordingly, LinTech requested periodic updates from Reddygari regarding the status of the FAA Project and the FAA's concerns, as well as whether the project would be sent out for a rebid or otherwise end. (*Id.* at Pg. ID 596-97 ¶¶ 22, 24.) LinTech also relied on Reddygari to report on whether the FAA ever contemplated replacing LinTech as the prime contractor on the FAA Project. (*Id.* at Pg. ID 597 ¶ 24.) Reddygari informed Mr. Lin that the FAA Project would extend beyond April 2020. (*Id.* at Pg. ID 596 ¶ 22.) Reddygari never told LinTech that the FAA Project would be rebid or

LinTech's contract for the FAA Project was in jeopardy of being terminated. (*Id.* at Pg. ID 596 ¶ 23.)

Without prior warning or notice, Reddygari resigned from her employment with LinTech on May 14, 2019. (*Id.* at Pg. ID 597 ¶ 25 (citing Ex. B, ECF No. 37-3).) On the same day, CAN terminated its subcontract with LinTech. (*Id.* at Pg. ID 597 ¶ 26 (citing Ex. D, ECF No. 37-5).) And on the same day, the FAA ended its relationship with LinTech and awarded CAN a contract to do substantially the same project as the FAA Project ("FAA/CAN Contract"). (*Id.* at Pg. ID 597 ¶¶ 26, 27 (citing Ex. C, ECF No. 37-4).) LinTech alleges that the FAA never publicly solicited bid proposals for the work associated with the FAA/CAN Contract such that LinTech had the opportunity to rebid for the FAA Project. (*Id.* at Pg. ID 597 ¶ 29.) Rather, the FAA awarded the contract to CAN without competition. (*Id.*)

LinTech alleges that the FAA/CAN Contract included a total award price of $6,900,742.40 and Reddygari knew that LinTech was interested in maintaining the FAA Project work. (*Id.* at Pg. ID 597 ¶¶ 28, 30 (citing Ex. C, ECF No. 37-4; Ex. E, ECF No. 37-6).) LinTech further alleges that CAN had no experience as a prime contractor for the government prior to the award of the FAA/CAN Contract. (*Id.* at Pg. ID 598 ¶ 31.) Upon LinTech's information and belief, Reddygari solicited the FAA/CAN Contract and Defendants used LinTech's confidential and

6

proprietary pricing, technical, process, customer, staffing and labor information to secure the FAA/CAN Contract. (*Id.* at Pg. ID 598 ¶¶ 35, 36.)

After Reddygari resigned and CAN terminated the Subcontractor Agreement, Defendants retained laptop computers which were paid for and owned by LinTech. (*Id.* at Pg. ID 598 ¶ 33.) These computers contained LinTech's proprietary and confidential information and were utilized for purposes of performing the FAA Project. (*Id.*) On May 17, LinTech sent Defendants a letter titled "Demand for Cease and Desist and Preservation of Records," which states in relevant part:

- You will cease utilizing any and all of LinTech's confidential and proprietary business information and return same and/or confirm that it has been deleted from your systems;

- You will not solicit any LinTech employee;

- You will keep LinTech confidential and trade secret information secure and will not use it for your own purposes; and

- You will return all of LinTech's property, including the fifteen (15) laptop computers taken from LinTech's premises.[1]

(*Id.* at Pg. ID 599 ¶ 37 (citing Ex. F, ECF No. 37-7).) The letter also demanded that Defendants retain all potential evidence pertaining to the matter and "**not []**

---

[1] LinTech subsequently learned that 12 laptop computers were taken—not 15. (ECF No. 37 at Pg. ID 599 ¶ 37 n.1.)

7

**reformat [their] home or work computers or change or delete any information contained therein**." (Ex. F, ECF No. 37-7 (emphasis in letter).) Defendants responded, through their attorney, stating that they would return the computers to LinTech "(returned to factory setting and cleaned of C[AN] Softech as well as contract information []per direct instructions from the U.S. government)." (Ex. G, ECF No. 37-8 at Pg. ID 639.)

Defendants returned the computers to LinTech on May 22—eight days after the FAA/CAN Contract was awarded. (*Id.* at Pg. ID 598, ¶ 34.) Counsel for LinTech subsequently requested that Defendants affirm that they had neither used nor disclosed LinTech's confidential and proprietary relative to the FAA Project. (*Id.* at Pg. ID 600, ¶ 39 (citing Ex. H, ECF No. 37-9).) Defendants, through counsel, refused to do so. (*Id.*)

On May 24, LinTech filed suit against Defendants in Oakland County Circuit Court. (*See* ECF No. 1 at Pg. ID 7.) On May 30, Defendants removed the case to federal court pursuant to 28 U.S.C. § 1441(b). (*Id.* at Pg. ID 2.) LinTech subsequently filed a Motion to Amend Complaint, seeking leave to add a Tortious Interference with a Business Relationship or Expectancy claim against both Defendants. (ECF No. 26.) In its April 14, 2020 Opinion and Order, the Court found that Defendants' legal duty to not "intentionally and wrongfully interfere by inducing or causing a . . . termination of the business relationship or expectancy"

between LinTech and the FAA was "separate and distinct" from Defendants' contractual obligation "to keep confidential and propriety information secure and only use that information to perform [their] duties" related to the FAA Project. (ECF No. 36 at Pg. ID 588.) Accordingly, the Court granted LinTech's motion. (*Id.* at Pg. ID 589.)

On May 8, Defendants' filed a Partial Motion to Dismiss Plaintiff's First Amended Complaint. (ECF No. 38.) In their motion, Defendants ask the Court to dismiss Count V of the Amended Complaint, Tortious Interference with a Business Relationship or Expectancy. (*Id.* at Pg. ID 673.)

## APPLICABLE STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To survive a motion to dismiss, a complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action . . .." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not "suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

9

As the Supreme Court provided in *Iqbal* and *Twombly*, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id*. (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). The plausibility standard "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Twombly*, 550 U.S. at 556.

In deciding whether the plaintiff has set forth a "plausible" claim, the court must accept the factual allegations in the complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). This presumption is not applicable to legal conclusions, however. *Iqbal*, 556 U.S. at 668. Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555).

Ordinarily, the court may not consider matters outside the pleadings when deciding a Rule 12(b)(6) motion to dismiss. *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Hammond v. Baldwin*, 866 F.2d 172, 175 (6th Cir. 1989)). A court that considers such matters must first convert the motion to dismiss to one for summary judgment. *See* Fed. R. Civ. P 12(d). However,

"[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to [the] defendant's motion to dismiss, so long as they are referred to in the [c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

## APPLICABLE LAW AND ANALYSIS

Defendants argue that the Court should dismiss LinTech's tortious interference claim for two reasons. First, the claim is barred "to the extent [that it] alleges facts indistinguishable from [LinTech's] breach of contract claim." (ECF No. 38 at Pg. ID 672.) Second, the claim is preempted by the Michigan Uniform Trade Secrets Act ("MUTSA"). (*Id.*)

The Court need not reach the question of whether LinTech's tortious interference and breach of contract claims are factually indistinguishable. As the Court explained when granting LinTech's motion to amend its Complaint to add the tortious interference claim (ECF No. 36 at Pg. ID 588-89), "the same conduct can establish viable causes of action in contract and in tort if 'separate and distinct' legal duties support those claims." *Consol. Rail Corp. v. Grand Trunk W. R.R. Co.*, No. 09-10179, 2009 WL 3460334, at *7 (E.D. Mich. Oct. 22, 2009) (citing *Rinaldo's Constr. Corp. v. Mich. Bell Tel. Co.*, 559 N.W.2d 647, 657-58 (Mich.

11

1997)) ("A party will not be foreclosed from bringing contract and tort claims merely because the same conduct allegedly breaches both contract and tort obligations."); *see also Davis v. Venture One Constr., Inc.*, 568 F.3d 570, 576 (6th Cir. 2009) ("The requirement of a 'separate and distinct' duty from a contractual duty refers to a 'separate and distinct' legal duty, not a 'separate and distinct' task.")). Here, Defendants' alleged contractual duties are separate and distinct from their legal duty to not intentionally and wrongfully interfere with LinTech's business relationships or expectancies.

Defendants next contend that LinTech's tortious interference claims are based on the allegation that Defendants acted in violation of MUTSA and, because MUTSA preempts other tort claims, the tortious interference claim must fail. (ECF No. 38 at Pg. ID 677.) MUTSA provides for statutory action and remedies for the misappropriation of trade secrets. Mich. Comp. Laws § 445.1903, 1904. It is true that MUTSA preempts state tort claims providing civil remedies for the misappropriation of trade secrets. Mich. Comp. Laws § 445.1908(1). MUTSA, however, does not displace "[o]ther civil remedies that are not based upon misappropriation of a trade secret." Mich. Comp. Laws § 445.1908(2)(b). "In determining whether a tort claim is displaced, courts examine whether the claim is based solely upon the misappropriation of a trade secret. If so, the claim must be

12

dismissed." *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 946 (W.D. Mich. 2003) (citations omitted).

Under Michigan law, a claim for tortious interference with a business relationship or expectancy "requires proof of (1) a valid business relationship or expectancy; (2) knowledge of that relationship or expectancy on the part of the defendant; (3) an intentional interference by the defendant inducing or causing a breach or termination of that relationship or expectancy; and (4) resulting damage to the plaintiff." *Warrior Sports, Inc. v. Nat'l Collegiate Athletic Ass'n*, 623 F.3d 281, 286 (6th Cir. 2010). As to the third element, tortious interference claims "must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in the law for the purpose of invading the contractual rights or business relationship of another." *Bhan v. Battle Creek Health Sys.*, 579 Fed. Appx. 438, 443 (6th Cir. 2014) (citing *CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 812 (Mich. Ct. App. 2002)). To establish that a Defendant's conduct lacked justification and exhibited malice, "the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *Dalley v. Dykema Gossett*, 788 N.W.2d 679, 696 (Mich. Ct. App. 2010).

To support its Tortious Interference with a Business Relationship or Expectancy claim, LinTech argues that Defendants "used LinTech's confidential

13

and proprietary pricing, technical, process, customer, staffing and labor information, in violation of MUTSA, in order to secure the [FAA/CAN Contract]." (ECF No. 37 at Pg. ID 605 ¶ 67.) If this was the only factual allegation supporting LinTech's tortious interference claim, the Court may agree that the claim is based solely on the misappropriation of trade secrets.

However, Paragraph 61 of the Amended Complaint incorporates all allegations in the preceding paragraphs into the tortious interference claim. (*Id.* at Pg. ID 604 ¶ 61.) While some of those allegations also touch on the misappropriation of trade secrets, they further include that (i) "Mr. Lin requested periodic updates from Ms. Reddygari regarding . . . whether the project would ever be sent out for a re-bid or otherwise end . . . [and] Ms. Reddygari . . . informed Mr. Lin that the FAA Project would extend beyond April 2020"; (ii) "Ms. Reddygari never told LinTech that . . . the FAA Project was in jeopardy of being terminated"; and (iii) Defendants "impermissibly solicit[ed] the [FAA/CAN Contract]." (*Id.* at Pg. ID 596 ¶¶ 22-23, 598 ¶ 36, 600 ¶¶ 41-42, 601 ¶ 46, 604 ¶ 64.) LinTech also contends that "Ms. Reddygari knew that LinTech was interested in maintaining the FAA Project" and that Defendants' interference "caused LinTech significant damages." (*Id.* at Pg. ID 597 ¶ 28, 605 ¶ 65.) Viewing the factual allegations in the light most favorable to LinTech, if LinTech's claim is that—in order to secure the FAA/CAN Contract—Defendants (i) opted not to inform LinTech that the FAA

14

Project may be terminated; (ii) misled LinTech by informing it that the FAA Project would continue beyond April 2020; and (iii) solicited the FAA to award the FAA/CAN Contract to them, then LinTech's tortious interference claim would be based on wrongful conduct independent of the misappropriation of trade secrets. *See Bliss*, 270 F. Supp. 2d at 949-50.

In sum, to the extent that LinTech's tortious interference claim rests only upon the misappropriation of "confidential and proprietary pricing, technical, process, customer, staffing and labor information"—which LinTech concedes "constitute[] [] trade secret[s]"—the claim is preempted by MUTSA. (ECF No. 37 at Pg. ID 603 ¶¶ 53-54, 605 ¶¶ 66-67). However, to the extent the tortious interference claim rests upon the three grounds described above, it may proceed to discovery.

## CONCLUSION

For the reasons set forth above, the Court finds that LinTech's Tortious Interference with a Business Relationship or Expectancy claim withstands Defendants' Partial Motion to Dismiss.

Accordingly,

**IT IS ORDERED** that Defendants' Partial Motion to Dismiss Plaintiff's

First Amended Complaint (ECF No. 38) is **DENIED**.

    **IT IS SO ORDERED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 17, 2021